# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **LEFRANTE WILLIAMS,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:20-cv-2006-ACA |
| | ) |
| **BIRMINGHAM CITY SCHOOLS,** | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff LeFrante Williams is a teacher for the Birmingham City Schools. In 2017, she filed a lawsuit against the Birmingham City Schools alleging that a male teacher sexually harassed her. After she transferred to a different Birmingham school in August 2018, the new school's assistant principals began issuing false reprimands about her, culminating in the principal placing her on administrative leave with pay. Ms. Williams alleges this treatment amounted to a retaliatory hostile work environment and sued the Birmingham City Schools, asserting that it violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). (Doc. 4). Birmingham moves for summary judgment. (Doc. 16). Because there are genuine disputes of fact about whether Ms. Williams experienced a hostile work environment in retaliation for her 2017 lawsuit, the court **DENIES** Birmingham's motion for summary judgment.

## I. BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted). Accordingly, the court's description of events accepts as true Ms. William's version of events, bearing in mind that a jury may make findings different from the facts described in this opinion. *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

Ms. Williams has worked at various schools in the Birmingham City School District on and off since October 2004. (Doc. 17-1 at 6–8). In 2017, she complained internally and with the Equal Employment Opportunity Commission about a male teacher's sexual harassment and ultimately sued the Birmingham City Schools for violating Title VII. (*Id.* at 8–13; doc. 17-12 at 1–9). Shortly before she filed her 2017 lawsuit, she transferred to Arrington Middle School to escape the hostile work environment at the school where the male teacher worked. (Doc. 17-1 at 8). Ms. Williams remained at Arrington for a year. (*Id.* at 8).

In late July 2018, Ms. Williams had the opportunity to interview with one of Wenonah High School's assistant principals, Misha Randle, for a position at

Wenonah. (*Id.* at 17). Ms. Randle said she would recommend Ms. Williams for the position but that Wenonah's newly hired principal, Dr. Willie Goldsmith, first had to approve the transfer. (*Id.* at 17–18). A day or two later, Ms. Randle told Ms. Williams that Dr. Goldsmith had approved the transfer. (Doc 17-1 at 18).

Despite receiving Dr. Goldsmith's approval for the transfer, Ms. Williams continued to work at Arrington for the first two weeks of the school year. (*Id.* at 19). She began teaching at Wenonah on August 12, 2018. (*Id.* at 19). Ms. Williams soon clashed with Ms. Randle. (*Id.* at 20–25). For example, although Ms. Williams was hired to teach biology, Ms. Randle changed her class assignment to physical science at the last minute and, faced with Ms. Williams' concern about the change, told her she could "go on back to Arrington." (Doc. 17-1 at 20–21). Ms. Randle also borrowed a ladder from Ms. Williams and refused to return it. (*Id.* at 22).

Issues with Ms. Randle prompted Ms. Williams to request a meeting with Dr. Goldsmith on October 24, 2018. (*Id.* at 20–21). During the meeting, Dr. Goldsmith revealed to Ms. Williams that the teacher she had complained about in 2017 was his fraternity brother and that his fraternity brothers were no longer talking to him because he had hired her to teach at Wenonah. (*Id.* at 21). But he insisted that he wanted Ms. Williams to work at Wenonah because he had seen her teaching record and test scores. (Doc. 17-1 at 21).

3

Several days after her meeting with Dr. Goldsmith, Ms. Williams discovered that Human Resources had never received her transfer paperwork despite Dr. Goldsmith's statement to her that he had submitted it. (*Id.* at 26–27). Human Resources advised Ms. Williams to complete a transfer request electronically, which she did. (*Id.* at 27). But by that time, Wenonah had no remaining spots for a teacher and Human Resources could not move forward with processing her request. (Doc. 17-11 at 4–5); *see also* Ala. Code § 16-13-232(a). Birmingham permitted Ms. Williams to remain at Wenonah as a temporary assignment, but she did not appear on Wenonah's service reports and continued to be paid as though she taught at Arrington. (Doc. 17-11 at 4–5; *see also* doc. 17-1 at 27). On at least one occasion, this meant she had to report to Arrington to get the Arrington principal to sign her timesheet. (Doc. 17-1 at 28).

In addition to the issue with her transfer paperwork, soon after the October meeting with Dr. Goldsmith Ms. Williams also began having problems with Wenonah's other assistant principal, Sandra Jackson. (*See id.* at 24). Once, Ms. Jackson reprimanded Ms. Williams for assisting a student crying in the hallway and on another occasion, she reprimanded Ms. Williams for keeping students from moving to their next class while Ms. Williams was breaking up a fight in the hallway. (*Id.* at 27–28; doc. 17-4 at 40–41).

4

Ms. Williams' problems with Ms. Randle continued as well. In December 2018, Ms. Randle made "comments" about Ms. Williams on the school's PA system. (Doc. 17-1 at 28). In January 2019, Ms. Randle tore down decorations in Ms. Williams' classroom. (*Id*. at 23). At the beginning of the second semester, Dr. Goldsmith instructed faculty that too many students were receiving failing grades and that teachers "needed to make it right." (*Id.* at 28). Ms. Williams had already posted her students' grades and refused to change them to higher grades, so she was written up for failing to post her grades on time. (*Id.*).

In early March 2019, a student showed Ms. Williams a picture of another student crying while sitting on the floor of the bathroom. (Doc. 17-1 at 28). Ms. Williams spoke with the student in the picture and determined she had been skipping class. (*Id.* at 29). After she left the student with another teacher, the other teacher learned that the student and another student had been engaging in sexual activity in the restroom. (*Id.*). The school's counselor, who was part of the same sorority as Ms. Randle and Ms. Jackson, learned of the incident and asked whether Ms. Williams had been involved. (*Id.*). The next day, a parent reported Ms. Williams and the other teacher to the police for viewing and allowing students to view pornographic images. (Doc. 17-1 at 29). The police questioned Ms. Williams and two other teachers until Dr. Goldsmith told them the allegations were false. (*Id.*).

On March 6, 2019, Dr. Goldsmith placed Ms. Williams on administrative leave with pay for reasons that he did not disclose to Ms. Williams.[1] (*Id*. at 28–29; doc. 17-11 at 6). In August 2019, while she was still on administrative leave, Birmingham recommended transferring Ms. Williams to a different school within the district. (Doc. 17-1 at 29–30; doc. 17-11 at 6). Because Ms. Williams was unwilling to change schools, she requested a conference in front of the Board of Education to discuss the proposed transfer. (Doc. 17-1 at 30). During this transfer conference, Dr. Goldsmith falsely stated that nobody had interviewed Ms. Williams for a position at Wenonah and he was unaware she had been hired there. (*Id.* at 27, 30).

After the transfer conference, the Board of Education declined to further pursue an involuntary transfer. (*Id*. at 30; doc. 17-11 at 7). Ms. Williams remained on administrative leave with pay until August 2020. (Doc. 17-1 at 30; doc. 17-11 at 6–7). At that point, she was reinstated and officially transferred to Wenonah. (Doc. 17-1 at 30; doc. 17-11 at 7). Ms. Williams testified that, at the time of her deposition, harassment at Wenonah was "still ongoing." (Doc. 17-1 at 34).

---

[1] Dr. Goldsmith testified to a very different version of events leading to Ms. Williams' placement on administrative leave (doc. 17-10 at 15), but Ms. Williams testified that Dr. Goldsmith's version was not true (doc. 17-1 at 15). At summary judgment, the court must accept Ms. Williams' version. *See Hamilton*, 680 F.3d at 1318.

## II.   DISCUSSION

Birmingham moves for summary judgment on the grounds that Ms. Williams failed to file a timely charge with the Equal Employment Opportunity Commission, she failed to establish a *prima facie* case of retaliation, and it had legitimate, non-retaliatory reasons for its actions. (Doc. 18 at 16–24). While its brief is not entirely clear, Birmingham appears to believe Ms. Williams' retaliation claim rests on three discrete adverse actions: (1) the delay in formalizing her transfer to Wenonah; (2) the reprimands issued by Mmes. Jackson and Randle; and (3) her placement on administrative leave with pay. (*Id.* at 22). Ms. Williams responds that her claim is not for any discrete acts of retaliation, but instead for providing a retaliatory hostile work environment. (Doc. 22 at 27). Birmingham replies that Ms. Williams did not properly plead a retaliatory hostile work environment claim. (Doc. 25 at 6).

Ms. Williams' amended complaint asserts a single claim titled "Title VII Retaliation." (*See generally* doc. 4). She specifically alleges that she "endured hostile and differential treatment from the administration at Wenonah High School" (*id.* at 4 ¶ 25), and that Birmingham City School's retaliation took the form of "subjecting her to acts of discrimination, harassment and humiliation" (*id.* at 5 ¶ 27). She also described many of the underlying actions that she alleges amounted to harassment, such as the failure to submit her transfer paperwork, hostility from Mmes. Jackson and Randle, Dr. Goldsmith refusing to sign her time sheet, being

7

questioned about having sexual contact or inappropriate conversations with students, and being placed on administrative leave. (*Id.* at 3–4 ¶¶ 10–23).

To borrow a phrase from the Eleventh Circuit in another retaliatory hostile work environment case, Ms. Williams' amended complaint is "not a model of clarity," largely because her "hostile-work-environment claim[ ] appear[s] in a single line of her complaint." *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1205 (11th Cir. 2021). But the Eleventh Circuit in *Babb* found that single line sufficient to preserve the retaliatory hostile work environment claim. *See id* at 1205–06*.* Likewise, this court finds that Ms. Williams' amended complaint adequately alleges that Birmingham retaliated against her by providing a hostile work environment. Her references to retaliatory harassment and description of some of the allegedly harassing behavior suffices to put both Birmingham and the court on notice that she is asserting a retaliatory hostile work environment claim. *See, e.g.*, *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (stating that the Eleventh Circuit has occasionally used the term "retaliatory harassment" to refer to claims of retaliatory hostile work environment).

Birmingham's briefing on its motion for summary judgment rests on its assumption that Ms. Williams was asserting a claim or claims of retaliation based on discrete adverse actions. (*See generally* doc. 18 at 16–26). As a result, its arguments about the timeliness of Ms. Williams' EEOC charge miss the mark. (*See,*

*e.g.*, doc. 25 at 6–8 (arguing in reply that Ms. Williams' claim is untimely because she did not assert a retaliatory hostile work environment claim without addressing whether a retaliatory hostile work environment claim would be timely)). As for Birmingham's argument about the merits of Ms. Williams' claim, it relies entirely on the *McDonnell Douglas* test, which is one of the ways a plaintiff may typically establish a claim of retaliation based on circumstantial evidence. (Doc. 18 at 17–26; doc. 25 at 8–10); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Ms. Williams does not contest the use of the *McDonnell Douglas* test. (*See* doc. 22 at 31). But it is unclear whether the *McDonnell Douglas* framework is appropriate in analyzing a claim of retaliatory hostile work environment.

Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Under the *McDonnell Douglas* test, a plaintiff can establish a *prima facie* case of retaliation by showing "that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Once she has made that *prima facie* case, "the burden shifts to the employer to articulate some legitimate, [non-retaliatory] reason for the adverse employment action." *Id.* at 976; *see also Johnson*

*v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020). If the employer can do so, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext" for retaliation. *Crawford*, 529 F.3d at 976.

The Eleventh Circuit has held that one subset of Title VII retaliation is providing a hostile work environment. *Babb*, 992 F.3d at 1206–07; *Monaghan*, 955 F.3d at 861. However, the decisions addressing the standard for a retaliatory hostile work environment did not apply the *McDonnell Douglas* test or address whether the court can use the *McDonnell Douglas* framework to analyze such a claim. *See generally Babb*, 992 F.3d at 1209; *Monaghan*, 955 F.3d at 862–63. And *McDonnell Douglas* is an awkward fit when the plaintiff's *prima facie* case of retaliation is that of a hostile work environment instead of a discrete employment action like a failure to promote or a termination. How can an employer provide a legitimate, non-retaliatory reason for an environment? Does the employer have to provide a legitimate reason for every act that, viewed cumulatively, comprises the work environment?

Because the parties do not address this issue (*see* doc. 22 at 31–37; doc. 25 at 8–10), the court will assume, as the parties have, that the *McDonnell Douglas* test can be used for this kind of retaliation claim and conduct its analysis. Birmingham first argues that Ms. Williams cannot establish a *prima facie* case of retaliation because (1) she filed her lawsuit in 2017 and the hostile work environment did not

begin until late 2018; (2) Mmes. Jackson and Randle were never aware of her 2017 lawsuit and Dr. Goldsmith only learned of the 2017 lawsuit in September 2019, after Ms. Williams had been placed on administrative leave; and (3) Ms. Williams' theory actually rests on her perception that Dr. Goldsmith's motivation arose out of loyalty to his fraternity brother instead of opposition to her protected conduct (Doc. 18 at 18–20).

These arguments are insufficient to defeat Ms. Williams' *prima facie* case. With respect to the first two arguments, Ms. Williams has presented evidence that Dr. Goldsmith was aware of her lawsuit by October 2018, just as the hostile work environment was beginning. (*See* doc. 17-1 at 20–21, 26–27). Although a jury might not believe Ms. Williams' evidence on this point, the court cannot resolve that dispute at summary judgment. *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983) ("A trial court must not decide any factual issues it finds in the records; if factual issues are present, the court must deny the motion and proceed to trial.").

With respect to the third argument, the Supreme Court has noted that in rare cases, "an injured party can prove the existence of multiple, independently sufficient factual causes." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013) (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27, and cmt. b (Am. L. Inst. 2010)); *see also Bostock v. Clayton Cnty.*, 140 S. Ct.

1731, 1739 (2020) (citing *Nassar* to explain that events can "have multiple but-for causes"). In this case, there is evidence of two causes of Dr. Goldsmith's alleged hostility toward Ms. Williams: (1) she complained of sexual harassment; and (2) the person she accused of sexual harassment was his fraternity brother. Assuming a jury would find that Dr. Goldsmith permitted a hostile work environment, the jury would have to decide which of these causes actually motivated him.

Because Ms. Williams has evidence sufficient to establish a *prima facie* case of retaliation, the burden shifts to Birmingham to proffer legitimate, non-retaliatory reasons for its actions. *See Crawford*, 529 F.3d at 976. Birmingham, under the belief that Ms. Williams was asserting three discrete retaliatory actions instead of an entire environment, proffers one reason for each discrete action: (1) Ms. Williams caused the delay in approving her transfer by failing to properly request the transfer; (2) the reprimands issued by Mmes. Jackson and Randle were warranted; and (3) she was placed on administrative leave because she was creating a hostile work environment for Mmes. Jackson and Randle. (Doc. 18 at 22–26).

Having articulated reasons for its actions during the 2018–2019 school year, the burden shifts back to Ms. Williams "to show that the employer's stated reason was a pretext for discrimination." *Crawford*, 529 F.3d at 976. To do so, Ms. Williams must show both that the articulated reasons were false and that they

were pretext for retaliation. *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1298 (11th Cir. 2021).

Ms. Williams has presented evidence from which a jury could find that all of Birmingham's proffered reasons are false: she testified that she followed all instructions for properly submitting her transfer paperwork, that the reprimands Mmes. Jackson and Randle issued against her were false, and that the basis for the administrative leave was a lie. (Doc. 17-1 at 15, 26–28; doc. 17-4 at 40–41). And absent those reasons, a jury could find that retaliation was the true reason for the hostile work environment. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (holding that the factfinder may consider the evidence supporting a *prima facie* case when determining whether the plaintiff can establish pretext). Accordingly, the court **DENIES** Birmingham's motion for summary judgment.

**DONE** and **ORDERED** this September 22, 2022.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE